

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 713 | **DATE** | 5/9/2002 |
| **CASE TITLE** | In Re: Outboard Marine Corporation, etal | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: We affirm the decision of the bankruptcy court. The bankruptcy court did not err in finding it has core jurisdiction to adjudicate this claim and that the chapter 7 trustee had standing. Furthermore, the bankruptcy court did not err in finding that OMC's estate was entitled to the Trust corpus despite the claims of the Beneficiaries and BofA. We also affirm the bankruptcy court's decision that BofA did not have a lien that attached to the Trust corpus and that the Trust Agreement language limiting assignment was effective.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 10 2002 | 3 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | CDY | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/9/2002 | |
| | | | date mailed notice | |
| GL | courtroom deputy's initials | | GL | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

MAY 1 0 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
|     OUTBOARD MARINE CORPORATION, | ) | |
|     et al., | ) | |
| | ) | |
|                 Debtors. | ) | |
| ---------------------------------------------------------- | ) | No. 02 C 110 |
| | ) | |
| BANK OF AMERICA, N.A. | ) | |
|           Appellant, | ) | *02 C 713* |
| | ) | |
| | ) | |
| CERTAIN BENEFICIARIES OF THE OUTBOARD | ) | |
| MARINE CORPORATION RABBI TRUST | ) | |
|           Appellant, | ) | |
| | ) | |
|           v. | ) | |
| | ) | |
| ALEX D. MOGLIA, not individually, but as | ) | |
| chapter 7 trustee for Outboard Marine | ) | |
| Corporation and its Related Debtor Entities | ) | |
|           Appellee. | ) | |

MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Chief Judge:

      This case is before us on appeal from a final judgment of the United States Bankruptcy Court

for the Northern District of Illinois. The issue is disputed ownership of $13.5 million held in trust by

The Northern Trust Company for the benefit of certain executives of the Outboard Marine Corporation

("OMC"). Alex D. Moglia, trustee for OMC's bankruptcy estate, seeks to establish OMC's estate's

rights to the trust corpus and trust proceeds. Bank of America and certain beneficiaries of the trust have

their own ideas about who has rights to the money. After the bankruptcy trustee prevailed below, Bank

of America and the beneficiaries brought separate appeals which were thereafter consolidated in this

court on February 8, 2002. For the following reasons, we affirm the decision of the bankruptcy court.

## BACKGROUND

The facts of this case appear to be largely undisputed. OMC established the trust at issue (the "Trust") on December 18, 1987 and, by amendment on June 20, 1989, The Northern Trust Company ("Northern") was named trustee.[1] The Trust was created to provide a source of payment for several unfunded employee incentive and deferred compensation plans implemented by OMC for the benefit of some of its executives (the "Beneficiaries"). Such trusts are known as "rabbi trusts," and its beneficiaries are not taxed on their share of the corpus or its income until the assets are actually distributed.

The Trust Agreement provided that, upon a change in control at OMC, it was obligated to pay into the Trust an amount sufficient to fully fund the incentive and compensation plans. A change in control occurred in 1997 and OMC paid $13.8 million into the Trust. The Trust Agreement further provided that the Trust corpus was to remain at all times subject to the claims of OMC's general creditors and that the company shall not create a security interest in the corpus in favor of any creditor. Trust Agreement, § 4.03. It further provided that, in case of OMC's bankruptcy, Northern was required to seek direction from a court of competent jurisdiction or other person appointed by the court on how to make the Trust corpus available to satisfy the claims of OMC's general creditors. *Id.*

On January 6, 1998, OMC withdrew the cash from the Trust and obtained the issuance of an irrevocable letter of credit in the amount of approximately $13.8 million.[2] The letter of credit was issued

---

[1] The Trust, as amended, is governed by an Amended and Restated Trust Agreement ("Trust Agreement"). Dkt. #39, at ¶7 ("Dkt #" will hereafter refer to the specified tab number in the record on appeal).

[2] The Second Amendment to Amended and Restated Trust Agreement, dated August 13, 1997, permitted OMC to substitute a letter of credit for cash in the Trust. Brief of Appellants-Beneficiaries,

by NationsBank, N.A., and named Northern, as trustee of the Trust, as beneficiary. The letter of credit was issued under the terms of an Amended and Restated Loan and Security Agreement (as amended, the "Credit Agreement"). *See* Dkt. #46, at ¶1. Under the Credit Agreement, Bank of America ("BofA"), as agent for the lender parties thereto and successor to NationsBank, N.A., was granted a lien upon and security interest in, *inter alia*, OMC's General Intangibles. General Intangibles are defined in the Credit Agreement as:

> with respect to any Person, all of such Person's now owned or hereafter acquired general intangibles, choses in action and causes of action (whether arising in contract, tort or otherwise and whether or not currently in litigation) and all judgments in favor of such Person and all other intangible personal property of every kind and nature (other than Receivables), including, without limitation, all Proprietary Rights, corporate or other business records, . . . reversions or any rights thereto and any other amounts payable to such Person from any Plan or other employee benefit plan, . . . and any letter of credit, Guaranty, claim, security interests or other security held by or granted to such Person to secure payment by an Account Debtor of any Receivable.

Dkt. #46, at ¶2. BofA properly perfected its security interest in and lien upon OMC's General Intangibles by filing the necessary financing statement with the Illinois Secretary of State. Dkt. #46, at ¶3.

OMC filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, on December 22, 2000. Alex D. Moglia was appointed trustee of OMC's bankruptcy estate on or about August 24, 2001, after OMC's case was converted to a chapter 7.[3] At the time of OMC's bankruptcy filing, the letter of credit was still outstanding. On or around August 28, 2001, however, Northern drew under the letter of credit and was paid the face amount, approximately $13.8 million, by the issuing bank.

---

Ex. D.

[3]Due to possible confusion over indiscriminate use of the word "Trustee," Alex D. Moglia, not individually but as chapter 7 trustee for OMC, will hereinafter be referred to as "Moglia".

Subsequent to OMC's bankruptcy filing, the Official Committee of Unsecured Creditors of Outboard Marine Corporation (the "Committee") initiated the case below in order to establish OMC's general creditor's rights to the Trust corpus. After Moglia was appointed trustee of OMC's estate, he assumed prosecution of the case from the Committee. On November 13, 2001, after the other Beneficiaries were allowed to intervene, the bankruptcy court (Barliant, Bank. J.) entered judgment in favor of Moglia and against all defendants. BofA filed an appeal to this court on behalf of OMC's prepetition lenders and the Beneficiaries filed two separate appeals. Those three appeals have been consolidated in this court for disposition in this order.[4]

BofA, on behalf of the secured lenders and pursuant to the Credit Agreement, claims a perfected security interest in the Trust corpus. The basis for its claim is its lien on OMC's General Intangibles pursuant to the Credit Agreement and its belief that this lien also attaches to the Trust corpus. Moglia, on the other hand, relies on the language of the Trust Agreement itself and asserts that the Trust corpus is property of OMC's bankruptcy estate and subject to the claims of its general creditors. Finally, the Beneficiaries, after voicing jurisdictional concerns, argue that the original issuance of the letter of credit and the terms of the Credit Agreement constitute a distribution of the Trust corpus to the Beneficiaries that should give them a priority interest in the corpus over and above the interest of OMC's general creditors and BofA.

We have appellate jurisdiction pursuant to 28 U.S.C. § 158(a).

## ANALYSIS

A.    STANDARD OF REVIEW

As a conclusion of law, a grant of summary judgment by the bankruptcy court is reviewed *de novo* by the district court. The district court will affirm summary judgment if "there is no genuine issue

---

[4]Moglia's motion for leave to file sur-reply is denied.

as to any material fact and if the moving party is entitled to judgment as a matter of law." *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996). Summary judgment may be affirmed on any ground supported in the record, even if it was not relied upon by the court below. *Johnson v. Gudmundsson,* 35 F.3d 1104, 1115 (7th Cir. 1994). As the bankruptcy court made its determination below on the basis of legal conclusions on essentially undisputed facts, the standard of review is *de novo* as to each of the issues raised on appeal. *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998).

B.     JURISDICTION

### 1. Core Jurisdiction

In its Order Granting Summary Judgment on December 17, 2001, the bankruptcy court asserted 'core' jurisdiction over the adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(E), (K) and (O). Dkt. #24, p.2. In the alternative, the bankruptcy court asserted 'related to' jurisdiction pursuant to 28 U.S.C. § 157(c). *Id.*[5] The Beneficiaries appeal on this issue and argue that, for various reasons, the bankruptcy court lacked subject matter jurisdiction.

The primary basis for the Beneficiaries' claim is that, under the terms of § 4.01(a) and (b) and § 6.01(b) of the Trust Agreement, OMC, after funding the Trust following a change in control, had only a remainder interest in the Trust corpus after the claims of the Beneficiaries had been paid in full. But, the Beneficiaries continue, it is a matter of undisputed fact that the amounts due to the Beneficiaries exceeded the amount of the letter of credit. Accordingly, OMC, while legally entitled to a remainder interest in the corpus, was factually precluded from ever receiving a portion of the corpus because there would have been no remainder left over after the payment of the Beneficiaries' claims. Thus, arguing

---

[5]Because we believe the bankruptcy court's core jurisdiction is firmly established, we need not address the bankruptcy court's alternative 'related to' jurisdiction.

that OMC could never have received funds from the Trust, the Beneficiaries claim the Trust could not be considered property of the estate and, accordingly, the bankruptcy court did not have jurisdiction to adjudicate rights to the Trust.

By focusing exclusively on the *post facto* non-existence of funds available from OMC's remainder interest, the Beneficiaries have ignored the remainder *interest* itself. Whether or not OMC's remainder interest from the Trust produces any actual money is beside the point – by operation of the terms of the Trust Agreement, OMC still has a legal remainder interest. On this point, the Bankruptcy Code is illuminating. 28 U.S.C. § 157(b)(2)(E) states that core proceedings include "orders to turnover property of the estate." The essential question then becomes what is to be considered property of the estate. In establishing what constitutes a Debtor's estate, the Bankruptcy Code specifically includes "all legal and equitable *interests* of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added). What constitutes an estate, in other words, is not necessarily property *qua* property, but the legal and equitable interest in that property. Bankruptcy Judge Barliant stated as much in open court on December 10, 2001: "And, you know, what [§] 541 talks about is not property. It talks about interests in property. I think that's what I just tried to focus on." Dkt. #28, p.39

OMC's remainder interest is not, however, the only way the Trust corpus becomes property of OMC's estate. Section 4.03 of the Trust Agreement provides that "[i]t is the intent of the parties hereto that the Trust corpus is and shall remain at all times subject to the claims of the general creditors of the Company." To that end, § 4.03 further states that upon OMC's insolvency Northern "will make no further distributions of the Trust Corpus to any of the [Beneficiaries] but will deliver the entire amount of the Trust Corpus only as a court of competent jurisdiction . . . may direct to make the Trust Corpus available to satisfy the claims for the Company's general creditors." Upon OMC's bankruptcy filing on December 22, 2000, therefore, the Trust Corpus was no longer available to the Beneficiaries because

it was to be made available to satisfy the claims of OMC's general creditors. On this basis alone, the bankruptcy court would have core jurisdiction under § 157(b)(2)(E).

The bankruptcy court also asserted core jurisdiction pursuant to 11 U.S.C. § 157(b)(2)(K). That provision states that core proceedings include "determinations of the validity, extent, or priority of liens." BofA argues that its perfected lien in OMC's General Intangibles pursuant to the Letter of Credit extends to the Trust corpus and that, on this basis, the bankruptcy court had jurisdiction to resolve the validity, extent, and priority of BofA's lien. Finally, the bankruptcy court asserted core jurisdiction pursuant to 11 U.S.C. § 157(b)(2)(O), addressing "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship . . ." 11 U.S.C. § 157(b)(2)(O). The Beneficiaries' primary argument against core jurisdiction under §157(b)(2)(K) and (O) is that, since the Trust corpus (held, as it was at the time of bankruptcy, as a Letter of Credit) is not property of the estate, core jurisdiction under any subsection of § 157(b) simply cannot hold. However, contrary to the Beneficiaries' repeated assertions and as argued throughout this opinion, the Trust corpus *is* property of the Estate and, as such, the bankruptcy court properly exercised its core jurisdiction.

## 2. Legitimate Adjustment of Claims

The Beneficiaries emphasize in their argument that Moglia, as OMC's bankruptcy trustee, is impermissibly asserting the claims of one group of creditors (the general creditors) against other groups of creditors (the Beneficiaries and BofA). As such, argue the Beneficiaries, this action was not brought "to enforce the Debtor's rights under the Trust, nor was it an action to collect property of the estate generally for creditors." Beneficiaries Brief, p.6. It is, rather, a dispute "between two groups of creditors to funds held by a third party in which the Debtor no longer has any interest." *Id.* at 8. This characterization is incorrect.

In *Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir. 1994), the Seventh Circuit determined that this sort of scenario does indeed sometimes deprive the bankruptcy court of jurisdiction. It explained that:

> [t]here is a difference between a creditor's interest in the claims of the corporation against a third party which are enforced by the trustee, and the creditor's own direct – not derivative – claim against the third party, which only the creditor himself can enforce.

*Id.* at 893. But the Beneficiaries argument in this regard is sufficient only if its premise holds true. That is, if it were true that the bankruptcy court through the trustee merely determined the rights of some creditors against others, then jurisdiction might indeed be lacking under the rubric outlined in *Steinberg*. However, it is not the case that the estate of the Debtor has no interest in the Trust corpus. Nor is it the case that Moglia is merely asserting the claims of one group of creditors. The bankruptcy court, in its December 17, 2001 order and in court comments made on December 10, 2001, clearly stated that judgment in favor of Moglia was not in favor of any one group of creditors. Rather, the court's order granting summary judgment and directing Northern to transfer the trust corpus to Moglia specifically states that "[t]he Trustee shall not disburse any of the Proceeds absent further order of court." Dkt. #24, ¶5. Judge Barlient's comments on December 10, 2001 illuminate his ruling:

> I did not make any determination about what happened to these trust proceeds once they're paid by the trust – by the Northern Trust to the bankruptcy trustee. I just haven't determined that. . . By the same token I did hold that the banks and the [Beneficiaries] had no interest in the trust corpus. But, again, I didn't resolve what would happen once the property was turned over to the trustee. It seems to me that's an entirely separate issue.

Dkt. #28, pp.38-39.

The Seventh Circuit has recognized that "[a]djusting competing claims of creditors to the property of a bankrupt is the central function of bankruptcy law." *Matter of Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987) (further stating that "bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt's assets"). One need only look to the text of Judge Barliant's

order and his associated comments to discover that 'adjusting competing claims' is precisely what he has done and that, accordingly, jurisdiction was proper.

### 3. Property of the Estate

The facts demonstrate that on the date of OMC's bankruptcy filing, the Trust corpus was held by Northern in the form of a letter of credit. The peculiar nature of the Letter of Credit gives rise to the Beneficiaries' final argument: that the original issuance of the Letter of Credit on January 6, 1998 constituted a constructive distribution of the trust corpus to the Beneficiaries. Due to this constructive distribution, the Beneficiaries argue, the creditors of OMC and the subsequent bankruptcy trustee had no claim to the Trust corpus and, accordingly, the bankruptcy court lacked jurisdiction.

It is undisputed that the Trust at issue is a grantor trust – sometimes called a "rabbi trust"[6] – in which an employer makes contributions to the trust in the name of beneficiaries to create a source of funding for otherwise unfunded benefit plans. Because the trust corpus technically remains property of the employer, the beneficiaries of the trust are not taxed on their portion of the Trust corpus or Trust proceeds until the assets are actually distributed to the beneficiaries. *See generally,* 26 U.S.C. § 671 *et seq.*; *McAllister v. Resolution Trust Corp.,* 201 F.3d 570, 575 (5th Cir. 2000). As a condition for this tax benefit, rabbi trusts are required to remain at all times subject to the claims of the grantor's general creditors. Thus, once a grantor files for bankruptcy, the rabbi trust corpus becomes property of the grantor's bankruptcy estate. *See, e.g., Goodman v. Resolution Trust Corp.,* 7 F.3d 1123 (4th Cir. 1993).[7]

---

[6]Rabbi trusts are "based upon the type of trust that was established by the congregation of a synagogue to benefit its rabbi and approved as tax-free by the Internal Revenue Service in a private letter ruling in 1980." BofA Brief, p.8 (*citing* PLR 8113107, 1980 WL 137740 (December 31, 1980).

[7]In denying some beneficiaries' claim to the corpus of a trust similar to the Trust *sub judice,* the court in *Goodman* noted that "the recipients of grantor or 'rabbi' trusts are unsecured creditors, who took the risks of being subject to the claims of general creditors for the benefits of favorable tax treatment – a gamble which failed to pay off in this case [due to the grantor's insolvency.]" *Goodman,* 7 F.3d at 1129.

The Beneficiaries argue that upon the issuance of the Letter of Credit in 1998, the rabbi trust "was converted to a secular trust. . . [and therefore] the general creditors and any subsequent bankruptcy trustee no longer had any claim to the Trust corpus." Beneficiaries Brief, p.14. In passing, the Beneficiaries cite to *Maher v. Harris Trust and Savings Bank*, 75 F.3d 1182 (7th Cir. 1996) as evidence that such a conversion is possible.

The Beneficiaries' reliance on *Maher*, however, is unavailing. In *Maher*, a debtor company, prior to becoming insolvent, converted its rabbi trusts to secular trusts. In this way, the trust funds were successfully removed from creditors' reach. In *Maher*, however, there was an express intention to effectuate such a conversion. Not only did the company's board of directors expressly approve the plan to "secularize" the trusts, but the company also paid the withholding taxes that were due on the funds when the income tax protection available under the rabbi trusts was no longer available. *Id.* at 1185. There is no indication of such a conversion in this case. OMC's board of directors did not express an intention to secularize its rabbi trust nor did OMC pay income tax on behalf of the Beneficiaries as a result of this presumed secularization. In short, the rabbi trust did not magically become a secular trust – and thus no longer part of OMC's estate – merely by the issuance of the Letter of Credit as the beneficiaries would have us believe, nor is there any authority whatsoever to indicate that such a thing is possible. The trust remained at all times a rabbi trust as it was created and there was no constructive distribution of the Trust corpus to the Beneficiaries.

However, in their short section dealing with the trust conversion issue the Beneficiaries highlighted a genuine problem: By their terms, the Trust Agreement and the Letter of Credit seem inconsistent. As described above, § 4.03 of the Trust Agreement clearly expresses the intent of OMC that the Trust corpus is to remain at all times subject to the claims of OMC's creditors. Indeed, it is on this basis (among others described above) that the Trust is considered part of OMC's estate and the

bankruptcy court has jurisdiction to adjudicate the competing claims to the Trust corpus. The terms of the Letter of Credit, however, contain no such provision in favor of OMC's creditors. The Letter of Credit specifies that Northern may draw on the funds *only* by certifying (1) that the amount drawn is an amount to be paid to the Beneficiaries (or Beneficiary) under the terms of the Trust or (2) that the issuer of the Letter of Credit has notified Northern that it will not be renewing the Letter of Credit. As the Beneficiaries point out, the Letter of Credit does not provide, as it easily could have, that Northern may draw by certifying that the amount drawn represents an amount to be paid to it for the benefit of OMC's general creditors.

To a certain extent, this issue of inconsistency between the Trust Agreement and the Letter of Credit became moot when Northern did in fact draw on the Letter of Credit in August 2001 after the bankruptcy proceedings began. We need not address mootness, however, because by notice on January 19, 2001, BofA (the issuer of the Letter of Credit) *did* inform Northern of its intent not to renew the Letter of Credit. Dkt. #8, Ex. 2(C). Therefore, Northern properly drew on the Letter of Credit in accordance with the second condition listed above. As such, the inconsistency trumpeted by the Beneficiaries is beside the point – while the Trust corpus was at one time held in the form of a Letter of Credit, it is now held as cash by Northern after Northern effectuated the draw on the Letter of Credit entirely in accordance with its terms.

It is axiomatic that the Trust Agreement, not the Letter of Credit, controls the Trust. That the Trust corpus was at the time of the bankruptcy held in the form of a Letter of Credit is merely a factual happenstance.

### 4. Standing

The Beneficiaries challenge Moglia's standing to prosecute this case under the theory that Moglia is only empowered to bring suits based on rights of the Debtor (as opposed to rights held by third

parties). The Beneficiaries argue that the chapter 7 trustee should not be able to bring a cause of action that belongs merely to OMC's unsecured creditors rather than to OMC or its creditors as a whole. They point out that "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2nd Cir. 1991). The bankruptcy court disagreed with that characterization, however, saying that "[h]ere the trustee on behalf of the creditors as a class is enforcing a common interest in specific identified property." Dkt. #27, p.3.

The Seventh Circuit's opinion in *Koch Refining v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1349 (7th Cir. 1987), *cert. denied,* 485 U.S. 906 (1988), is illuminating on this point. In *Koch,* the court pointed out that "[a [bankruptcy] trustee may maintain only a general claim. His right to bring a claim depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to *specific* creditors." *Id.* (citations omitted). The court continued:

> [a bankruptcy trustee] has no standing to bring *personal* claims of creditors. A cause of action is "personal" if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors.

*Id.*

In the present case, however, Moglia is not bringing a cause of action for the personal claims of a specific creditor. Instead, under the express terms of § 4.03 of the Trust Agreement, every "general creditor" of OMC has an interest in the Trust corpus. Any right to the Trust corpus is governed by the Trust Agreement and belongs to all general creditors of OMC as a class and not to any one creditor. Contrary to the Beneficiaries' belief, the bankruptcy trustee "represents not only the rights of the debtor but also the interests of the creditors of the debtor." *Koch,* 831 F.2d at 1342.[8]

---

[8] "The trustee's single effort," the court explained, "eliminates the many wasteful and competitive suits of individual creditors." Presciently, the court noted that the "[trustee's] actions as creditor representative may be resented, and the trustee may have to respond to attacks by individual creditors." *Koch,* 831 F.2d at 1342.

There is no indication that the Seventh Circuit reversed or weakened this principle in its subsequent decision in *Steinberg*, 40 F.3d at 890. The facts of *Steinberg*, in which a bankruptcy trustee sought to bring a veil-piercing claim against a debtor and its shareholders on behalf of a single creditor, are not remotely similar to the facts in the case at bar. Furthermore, we are not convinced that Moglia's action against Northern (as the third party) was a derivative claim. As such, Moglia had proper standing to bring the present action because he was the statutory representative of all of OMC's general creditors and his claim was brought on behalf of OMC's general creditors.

C.    SECURITY INTEREST IN TRUST CORPUS

Bank of America has appealed on three related issues. First, BofA argues that OMC, as owner of the Trust, had the power to assign its rights to the Trust corpus to BofA. Second, BofA argues that OMC, by using its power to assign, granted BofA a security interest in and lien upon OMC's rights to the Trust corpus. Finally, based on its security interest in the Trust corpus, BofA argues that its claim has priority over the claims of the Beneficiaries and OMC's general creditors.

**1. Power of Assignment**

The essence of BofA's claim is that its perfected lien on OMC's General Intangibles pursuant to the Credit Agreement includes an interest in the Trust corpus. Moglia does not dispute that BofA has a properly perfected security interest in OMC's General Intangibles. Rather, the dispute is whether that security interest includes the Trust corpus.

BofA argues first that OMC, as owner of the Trust, had the ability to assign its rights to the Trust corpus to BofA when it executed the Credit Agreement. It argues that, with regard to rabbi trusts, "nothing restricts the power of a grantor-company to assign its ownership interest in the funds to a lender as collateral for a loan." Indeed, BofA continues, Illinois commercial law and the UCC generally recognize and promote the free assignability of contracts. *See, e.g.,* E. Farnsworth, *Farnsworth on*

*Contracts*, § 11.2 (2d ed. 1998) ("[t]oday most contract rights are freely transferable").

BofA's argument regarding assignability fails. While it is true that contracts are usually freely transferable, in Illinois that freedom can be expressly proscribed by the contract itself. *See, e.g., Shaffer v. Liberty Life Assur. Co. of Boston*, 319 Ill.App.3d 1048, 1055-1056 (1st Dist. 2001) (where antiassignability provision is clear and unambiguous, court must enforce provision); *Green v. Safeco Life Ins. Co.*, 312 Ill.App.3d 577, 581 (5th Dist. 2000) (court must uphold unequivocal antiassignment provision in contract).[9]

It is true that Illinois law is not completely clear on its attitude toward antiassignment provisions. *See, e.g., Lomas Mortgage U.S.A., Inc. v. W.E. O'Neil Constr. Co.*, 812 F.Supp. 841, 844 (N.D.Ill 1993) (upholding an assignment despite antiassignment language where the terms did not specifically render void an attempted assignment); *Henderson v. Roadway Express*, 308 Ill.App.3d 546, 550 (4th Dist. 1999) ("Few Illinois decisions have addressed the issue of validity of antiassignment provisions at all"). However, even the court in *Lomas* (cited heavily by BofA) recognized that the intent of the parties to the contract is significant when assessing the validity of an antiassignment provision. *Lomas*, 812 F.Supp. at 844. While holding an assignment effective despite an antiassignment provision in the contract at issue, the *Lomas* court noted that to void the assignment in that case would have been "against the apparent intent of the parties and would advance no useful policy." *Id.*

In the present case, on the contrary, the intent to prohibit assignment is quite clear:

> It is the intent of the parties hereto that the Trust Corpus is and shall remain at all times subject to the claims of the general creditors of the Company. Accordingly, the

---

[9]BofA's argument that Illinois law recognizes a distinction between a "right" to assign and the "power" to assign presents the law on this point as more certain than it actually is. In *Shaffer*, 319 Ill.App.3d at 1055, the court noted that in four recent Illinois cases, the antiassignment provision at issue referred only to the power to assign and those courts nonetheless enforced the provisions. *See also In re Nitz*, 317 Ill.App.3d 119, 127 (2nd Dist. 2000) (noting that "[n]o 'magic' word is required to render an antiassignment provision effective"). Regardless, the Trust Agreement's provision specifying that OMC "shall not" create a security interest in the Trust could easily be read as a limit on OMC's power to assign *and* its right to assign.

> Company *shall not create a security interest* in the Trust Corpus in favor of the [Beneficiaries], the Participants, *or any creditor*.

Trust Agreement, § 4.03 (emphasis supplied). The Trust Agreement's proscription against the creation of a "security interest. . . in favor of. . . any creditor" unquestionably includes BofA. While the efficacy of antiassignment provisions in Illinois may be suspect when those provisions are equivocal or against the intent of the parties, there is no authority for disregarding them when they so unequivocally manifest that intent. As such, we will not disregard the clear language of the Trust Agreement, especially when it so unequivocally demonstrates the intent of the parties thereto. The antiassignment language of § 4.03 is valid.

Whatever rights and interests OMC had in the Trust corpus were defined by the Trust Agreement, and OMC could not grant rights it did not possess. Therefore, at the time OMC and BofA executed the Credit Agreement, OMC did not have the power to grant a security interest in the Trust corpus – it was simply never on the bargaining table.[10]

Next, BofA argues that § 9-318(4) of the Uniform Commercial Code (codified in Illinois as 810 ILCS 5/9-318(4))[11] renders ineffective the Trust Agreement's limitation on assignment. Section 9-318(4) of the UCC as enacted in Illinois provides that:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.

---

[10]Here we agree with Judge Barliant's comments in open court on November 13, 2001 that "[t]he provision that the debtor shall not create a security interest does deprive the debtor of the power to do so. The trust is not merely a right to receive payment, but defines interest in a particular identified property. Nobody has the power to deal with that property in a manner inconsistent with its interests in the property as defined by the trust." Dkt. #27, p.5.

[11]Revisions to UCC Article 9 in Illinois took effect on July 1, 2001. However, the previous Article 9, not the revision, applies to cases pending on July 1, 2001. *See* William C. Smith, *Article 9, Take 3*, 87 A.B.A. J. 52, 56 (August 2001). As the present action was commenced on February 26, 2001, we will use the previous Article 9 in this decision. All Illinois UCC citations in this opinion are the citations in effect prior to the revision.

15

810 ILCS 5/9-318(4). BofA contends that because the Trust Agreement is a contract between an "account debtor" (Northern) and an "assignor" (OMC) for "money due or to become due" (the Trust corpus) then the anti-assignment provision of the Trust Agreement is ineffective pursuant to the terms of § 9-318(4) of the Illinois UCC.

While the parties agree that OMC is properly considered an "assignor," they disagree over whether Northern is to be considered an "account debtor." An "account debtor" under the UCC is "the person who is obligated on an account, chattel paper, or general intangible." 810 ILCS 5/9-105(a). Thus, under BofA's formulation, Northern is an account debtor because it is the "person" obligated on the general intangible (the Trust corpus). Its obligation arises, according to BofA, pursuant to § 4.03 of the Trust Agreement requiring Northern to make payment to OMC in the event of insolvency.

Moglia, on the other hand, points out that § 4.03 of the Trust Agreement does not require Northern to pay money to OMC. Indeed, BofA has failed to cite any language in § 4.03 that requires or even permits Northern to pay OMC money under any circumstances. Rather, the Trust Agreement is very clear that, upon OMC's insolvency, Northern was to seek direction from a court of competent jurisdiction on how to make the Trust corpus available to satisfy the claims of OMC's general creditors. BofA has provided no argument that making the Trust corpus available to satisfy the claims of OMC's general creditors is at all analogous to paying the funds to OMC directly. In this way, we fail to see how Northern is to be considered an "account debtor" for the purposes of the Illinois UCC. Northern is neither indebted nor obligated to OMC *per se*. It is, rather, indebted to OMC's estate and its general creditors. *See, e.g., In re Bonnema*, 219 B.R. 951, 955-956 (N.D. Tex. Bankr. 1998).

Because Northern is not an account debtor, BofA's position is untenable. UCC 9-318(4) is inapplicable and the antiassignment language of § 4.03 of the Trust Agreement remains effective.

### 2. Security Interest

BofA and OMC do not dispute the validity of the BofA's properly perfected lien on OMC's

general intangibles. The disagreement, as mentioned above, is whether that lien attaches to the Trust Corpus. BofA's argument in this regard is that OMC had a sufficient ownership interest in the Trust corpus to assign that interest as part of its security obligations in the Credit Agreement. OMC, on the other hand, claims that if it did not have the right to grant a security interest in the Trust corpus then it could not have granted BofA such an interest. OMC argues that it simply did not have sufficient ownership interest in the Trust corpus to grant BofA its lien.

BofA points to various sections of the Trust Agreement that support a finding that OMC was the owner of the Trust corpus. In particular, BofA mentions § 6.01 (granting OMC a remainder interest in any portion of the Trust corpus that remains after termination of the Trust), § 4.01 (granting OMC various rights with respect to the Trust after a change in control), and § 4.03 (specifying Northern's responsibilities in case of OMC's insolvency) as support for its cause.

The difficulty of this issue stems from the nature of trusts themselves. A trust operates by separating the legal and equitable interests in property. Normally, the trustee of a trust is said to hold legal interest in the trust property for the benefit of the beneficiary, who holds equitable interest. *See* Restatement (Second) of Trusts, § 2, comment (f); George Bogert, The Law of Trusts and Trustees § 1, at 5 (2d ed. 1984). By its very nature, this separation of interests makes it difficult to describe the trust property in the ways to which we are accustomed. Thus, when ownership interests in property are separated because that property is held in trust, it is difficult to clearly define which party is the "owner" of that trust property with any certainty. The correct answer, obviously, is that both the trustee *and* the beneficiary are, in a sense, "co-owners" of the property in question. The issue becomes even more complicated when, as in the case here, the grantor itself is also a beneficiary because it has retained some indicia of ownership in the Trust – in the present case, those indicia of ownership are OMC's remainder interest in the Trust corpus (under § 6.01 of the Trust Agreement) and the possible reversion to OMC's

estate in the event of insolvency (under § 4.03 of the Trust Agreement).[12] Thus, the Trustee and the Beneficiairies (which here includes OMC) could be described, each in their own way, as "owners" of the Trust corpus. *See, e.g.,* Restatement (Second) of Trusts, § 2, comment (d).

In hindsight, it appears almost inevitable that this state of affairs could lead to conflict – that is, nebulous ideas of ownership notwithstanding, at some point, only one party gets the money. It therefore falls to us to decide some principled way of determining who gets the money. Judge Barliant made his principled decision by looking to the terms of the Trust Agreement itself, and such a method is eminently reasonable. After all, the indicia of ownership in the Trust corpus are defined in all respects by the Trust Agreement. It seems fair, therefore, to look to the Trust Agreement to resolve disagreement when it arises between the co-owners of that Trust property.

Section 4.01 of the Trust Agreement specifies that, upon a change of control at OMC, no part of the Trust corpus was to be returned to OMC except pursuant to § 4.01(b) or § 6.01 thereof. Because such a change in control occurred in 1997 (prior to the execution of the Credit Agreement in 1998) OMC's rights to the Trust corpus are defined by the terms of those two sections. Section 4.01(b) specifies that the Trust corpus is to be returned to OMC upon final payment of any amounts required to be paid to the Beneficiaries. Section 6.01 specifies two conditions under which the Trust would be terminated: by exhaustion of the Trust corpus, or by final payment of amounts to payable to the Beneficiaries. Section 6.01 concludes that "[p]romptly upon the termination of this Trust, any remaining portion of the Trust Corpus shall be paid to the Company." It is clear, therefore, that OMC had more than merely a nominal interest in the Trust corpus at the time it executed its Credit Agreement with

---

[12]There has been no argument that OMC's retention of these interests invalidates the Trust. Indeed, a trust grantor is generally permitted to reserve to itself any power with respect to the property. Restatement (Second) or Trusts, § 37, comment (a). Moreover, trust grantors are specifically permitted to be beneficiaries (or one of the beneficiaries) of the trusts they create. *Id.* at § 114.

BofA. Indeed, it had a remainder interest specifically defined by the Trust Agreement itself.[13]

But as argued *supra* in Section C.1, OMC's rights to the Trust corpus were similarly defined by § 4.03 of the Trust Agreement which clearly proscribed the granting of a security interest in the Trust corpus to any creditor. Were it not for the first two sentences of § 4.03, BofA's case would be a slam dunk. There is, however, no reason that the court should give effect to some sections of the Trust Agreement that give OMC certain indicia of ownership while ignoring other sections that specifically limit those indicia in ways directly relevant to this case. Again, OMC did not grant a security interest in the Trust corpus to BofA because it simply was not OMC's right to do so. OMC's ownership interest in the Trust was defined by the Trust Agreement and that ownership interest did not include the ability to grant a security interest in favor of any creditor.[14]

This result is also required because to rule otherwise would have the impermissible effect of amending the Trust Agreement by operation of the subsequently executed and separate Credit Agreement. Another way of looking at BofA's argument is that, by executing the Credit Agreement, OMC granted a security interest in the Trust corpus *despite* the express terms of § 4.03. In this way, the Credit Agreement could be viewed as a constructive amendment of the Trust Agreement by allowing the granting of a security interest. However, § 6.02 of the Trust Agreement sets forth the specific conditions required to amend its terms. Included as a condition in § 6.02 is the requirement that any amendment be by writing signed on behalf of "the parties hereto." Trust Agreement, § 6.02. Therefore, as a party to the Trust Agreement, Northern must sign any written amendment to the Trust Agreement. Northern was not, however, a party to the Credit Agreement. Therefore, any possibility that the Credit

---

[13] It is this remainder interest, as described *supra* in Section B.1, that creates one basis of the bankruptcy court's jurisdiction.

[14] It should be noted that the limitation on the granting of a security interest in § 4.03 is a general one applicable to the entire Trust agreement. There is no indication by the language that this provision only came into effect upon OMC's insolvency. The prohibition against granting a security interest existed regardless of OMC's insolvency.

Agreement operated as an amendment to the Trust Agreement is foreclosed because the conditions required for such an amendment were not met. *See* Restatement (Second) of Trusts, § 331, comment (d) ("If the settlor reserves a power to modify the trust only in a particular manner or under particular circumstances, he can modify the trust only in that manner or under those circumstances"). Simply put, it would be inappropriate to allow for the circumvention of the Trust terms pursuant to a subsequent and separate agreement among different parties.

We therefore affirm the decision of the bankruptcy court regarding the absence of a security interest in the Trust corpus. BofA has a properly perfected and valid lien on OMC's General Intangibles. That lien, however, does not extend to the Trust corpus. Put another way, by operation of § 4.03 of the Trust Agreement, OMC's General Intangibles did not encompass the Trust corpus in this case.

BofA argues finally that as a secured OMC creditor it should benefit from the normal order of priority applying to the disposition of an estate's assets. BofA is entirely correct in arguing that the "Trust Agreement does not govern the disposition of property of the Estate. The Bankruptcy Code does." BofA Brief, p.15. Thus, while we referred to the terms of the Trust Agreement to determine that the corpus was part of OMC's estate, we are not similarly bound to follow the direction of the Trust Agreement as to the subsequent disposition of that property. However, we need make no ruling on this matter because the bankruptcy court itself has yet to rule. The order granting summary judgment specifically ordered the Trustee not to disburse any of the Trust proceeds "absent further order of court." Dkt. #24, p.2. It would be inappropriate for this court to rule on the priority of distribution of assets when that issue has yet to be presented to us as an appealable final order.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the bankruptcy court. The bankruptcy court did not err in finding that it has core jurisdiction to adjudicate this claim and that the chapter 7 trustee had standing. Furthermore, the bankruptcy court did not err in finding that OMC's estate was entitled

to the Trust corpus despite the claims of the Beneficiaries and BofA. We also affirm the bankruptcy court's decision that BofA did not have a lien that attached to the Trust corpus and that the Trust Agreement language limiting assignment was effective.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: 5/9/02

# United States District Court
## Northern District of Illinois
### Eastern Division

Outboard Marine Corporation,etal          **JUDGMENT IN A CIVIL CASE**

v.                                        Case Number: 02 C 713

☐   Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☐   Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that We affirm the decision of the bankruptcy court. The bankruptcy court did not err in finding it has core jurisdiction to adjudicate this claim and that the chapter 7 trustee had standing. Furthermore, the bankruptcy court did not err in finding that OMC's estate was entitled to the Trust corpus despite the claims of the Beneficiaries and BofA. We also affirm the bankruptcy court's decision that BofA did not have a lien that attached to the Trust corpus and that the Trust Agreement language limiting assignment was effective.

Michael W. Dobbins, Clerk of Court

Date: 5/9/2002

Gladys Lugo, Deputy Clerk